Maurice **MANIKOWSKE**, an Incompetent Person, by Clarence Bladow, his Guardian, Plaintiff and Appellant,

v.

Thomas **MANIKOWSKE**, Defendant and Respondent.

No. 8197.

Supreme Court of North Dakota.

June 29, 1965.

Rehearing Denied Aug. 13, 1965.

See also, 136 N.W.2d 455 and 136 N.W. 2d 465.

Johnson, Milloy & Eckert, Wahpeton, for plaintiff and appellant.

Lewis & Bullis, Wahpeton, for defendant and respondent.

TEIGEN, Judge.

This appeal is from the judgment in an action tried to the court without a jury and the plaintiff, as appellant, has demanded trial de novo.

The plaintiff, Maurice Manikowske, and the defendant, Thomas Manikowske, are brothers. They will be referred to as Maurice and Thomas.

Maurice, through his guardian, brought action against his brother, Thomas, in claim and delivery for a 35-foot Noble drawbar with tires, tubes, and drag cart, and a 14-foot John Deere drag. In his action he also asks a money judgment in the amount of $9,364.62 as his claimed share of proceeds from a bee operation wherein the brothers raised bees and sold honey and other by-products. The action was coupled with a proceeding by attachment and possession was taken of the above-described personal property.

Thomas answered and counterclaimed. In his answer Thomas admitted Maurice owned the 35-foot Noble drawbar, and denied that Maurice owned the 14-foot John Deere drag and that he was indebted to Maurice on the bee operation. In his counterclaim he alleged that for many years the brothers conducted farming operations together; that, to a large degree, Thomas managed Maurice's affairs for which Maurice agreed to pay Thomas $250; and that he also had advanced money to or on behalf of Maurice on various occasions between January 1, 1958, and January 1, 1963, totaling $12,493.51, no part of which has been paid, except that Thomas had credited this account with Maurice's earnings in the bee operation in the amount of $6,993.-71, leaving an unpaid balance of $5,499.80. He also alleges damages in the amount of $100 for detention of the 14-foot John Deere drag by the attachment and $25 damages for wrongful detention of some wheels and tires for a disc. He alleges Maurice has in his possession attachments for a cultivator and a power takeoff belonging to Thomas and claims damages for detention in the amount of $1,215. He prays for judgment against the plaintiff in the amount of $6,839.80.

The plaintiff answered the counterclaim and denied the allegations of the counterclaim and alleges that the plaintiff was incompetent during said period to handle his own affairs. The plaintiff alleges that his brother, Thomas, and Thomas' wife, Martha, took care of his affairs but that at no time did he or they indicate Maurice owed them money and no bill was ever presented. He alleges that a personal, confidential, and fiduciary relationship existed through which Thomas owed Maurice the utmost of good faith which he had failed to exercise.

The case was tried to the court and, during the trial, other issues developed. Maurice claimed his brother, Thomas, had in his possession other articles of personal property, such as a motor scooter in the possession of Thomas' son, a television set, a refrigerator, a tail gate hoist, a hydraulic box lift, two corn cribs, and some micrometers. Thomas admitted his son had the motor scooter but claims it had been given him by Maurice. Thomas admitted he had a television set, refrigerator, tail gate hoist, and hydraulic lift. He also admits he has two corn cribs, one of which had been damaged, in which they each had a half interest. Thomas claimed the micrometers belong to him.

It also developed during the trial that, after the guardian had been appointed for Maurice in 1962, Thomas sold some of Maurice's flax which had been stored in Thomas' granary for $872.32 and retained the money; that the granaries had a value of $35; that the tail gate hoist and hydraulic lift had a value of $1,000; that it would be difficult to remove the tail gate hoist and hydraulic lift which were attached to a truck owned by Thomas and that removal would cause some damage to the truck.

The case was consolidated for the purpose of trial with two other cases and the trial lasted three days. Considerable testimony was taken. Certain exhibits were introduced in evidence, including a financial account for the years 1958, 1959, 1961, and 1962. These were introduced by Thomas as his claim against Maurice.

It appears the district court accepted this account as a starting point in resolving the business affairs between the brothers. The account showed a balance due Thomas from Maurice of $5,499.80. In this account certain credits are shown. Thomas credited Maurice with 10% of the income from the bee operation for the year 1958; whereas, on the witness stand, he admitted he should have been credited with 12½%. Therefore, the court added $542 as an additional credit. It also credited Maurice with the sum of $878.32, the proceeds from the flax sold. It found that Maurice had an interest in the granaries worth $35 but permitted Thomas to retain the same and credited that amount on account. It also found that the tail gate hoist and hydraulic lift box belonged to Maurice but were attached to Thomas' truck and that the fair value was $1,000. It ordered that Thomas should retain these articles of personal property and credited the sum of $1,000 to Maurice's account. It thus found credits in the amount of $2,455.32 which, subtracted from Thomas' claim of $5,499.80, left a balance of $3,044.48 due Thomas by Maurice and directed the entry of a money judgment against Maurice in that amount.

The district court also ordered and directed Thomas to deliver to Maurice the following items of personal property: motor scooter, wheels and tires for a disc, a 35-foot Noble drawbar, 14-foot John Deere drag, television set, and the refrigerator. The court found that Thomas was the owner of the micrometers and ordered that Maurice deliver to Thomas the cultivator attachments and the power takeoff.

The district court found each brother had some property belonging to the other and, therefore, did not allow damages in favor of either for wrongful detention of property.

This case is one of three cases brought by Maurice through his guardian. One of

the other cases involves an appeal from the County Court of Richland County from the county court's order refusing to compel an accounting by Martha Manikowske as executrix of the estate of Alice Manikowske, the mother of the brothers, and is entitled: "Clarence Bladow, guardian of the Estate of Maurice Manikowske, v. Thomas Manikowske, Martha Manikowske, and Martha Manikowske as executrix of the Estate of Alice Manikowske." It is reported in 136 N.W.2d 455.

The third case is also brought by Maurice through his guardian against his brother and his wife, individually and as executrix of the estate of Alice Manikowske. Other defendants named are the children of Thomas and Martha, namely, Penny, Bonny, and Thomas W.; The Guardian Life Insurance Company, a corporation; and New York Life Insurance Company, a corporation. It involves certain funds set up by the will of Alice Manikowske and two annuities. It is reported in 136 N.W. 2d 465.

Alice Manikowske died testate in 1953. Martha Manikowske, wife of Thomas, was named executrix. The estate inventoried at over $55,000. It consisted of six quarter-sections of farm land, plus a fractional tract of land. The lands were appraised at $46,000. The personal property was appraised at $9,423.85. The last will and testament of Alice Manikowske provided that Maurice receive a life estate in two quarter-sections of the land, two annuities, and two funds—one out of the assets of the estate in the amount of $1,500 to be used for Maurice's benefit in case of sickness, and the other, also in the amount of $1,500, to be set aside from earnings of the land to be used to pay taxes or to buy seed for Maurice if an emergency arose. The two quarter-sections in which Maurice received a life estate were devised to Thomas' children, Bonny and Penny, subject to the life estate in Maurice. Bonny and Penny were also bequeathed $2,000 each and there were additional bequests to others totaling $2,000. All of the rest and residue of the property was devised and bequeathed to Thomas and his wife, Martha, to share and share alike. The final decree of distribution was entered by the county court on October 6, 1953. Receipts from the heirs have not been filed and Martha Manikowske has not been discharged as executrix of the estate.

When the litigants' mother died in 1953, the brothers took over the operation of the farm land and continued living in the farm home. Thomas owns a full line of farm machinery and Maurice has acquired a limited amount of farm machinery. He purchased a tractor, a baler, two flat top trailers for hauling bales, and other odds and ends of farm machinery between 1953 and 1962. The land was farmed using the farm machinery of both brothers. However, each farmed his land as a separate farm unit. Thomas owned a combine and a swather and combined Maurice's crops. For this he made a charge of $1.50 per acre. Each of the brothers maintained his own machinery insofar as repairs and cost of operations were concerned. It appears some of the grain grown on both farms was comingled and stored in Thomas' granary. Both brothers worked on all of the land, except when Maurice was working the bee business.

Thomas was engaged in the bee business to produce honey and other by-products on a large scale. It was agreed that Maurice would care for the bees and handle the bee operation. Thomas had bee interests in North Dakota and Minnesota. In the winter the bees were moved to Texas and were returned in the spring. It was agreed Maurice would receive 12½% of the proceeds of the bee operation for his work in 1958. In 1959, however, Thomas purchased more bees. He testified that this made the operation larger and Maurice would share in a larger volume. Therefore, the percentage of the gross income to be paid Maurice for his work was reduced to 10%. However, it appears from the financial account submitted by Thomas that the gross income from bees in 1959 dropped to $14,000 from $21,000 in 1958.

It also grossed $14,000 plus in 1960. In 1961 it increased to almost $25,000. No explanation is made in the record for this inconsistency. It also appears from Thomas' account that in 1958 Thomas made no charge against Maurice for labor. However, starting in 1959, he charged Maurice $1,270 per year for hired labor on Maurice's farm. He testified he made the charge because it was necessary to replace Maurice's services in farming because his time was devoted to caring for the bees. A similar charge was made in 1960 and in 1961. These charges are in issue. Maurice and his guardian both deny this was agreed upon. In 1962 Thomas made a net charge against Maurice of $117.90 for labor and he received no credit for caring for the bees. This was the year Maurice was married and their troubles began and the brothers severed relations. Thomas charged Maurice $400 for a life insurance premium payment advanced in 1962. This was a premium payment upon a policy taken on Thomas' life as a substitute for an annuity policy directed by the will, the premiums of which were to be paid from the estate. Maurice had paid this premium in prior years but refused to do so in 1962 and it was paid by Thomas. This item is not a proper subject matter in this action. It is considered in the third case referred to above.

■ Most of the items contained in the financial account introduced by Thomas in support of his counterclaim are not in dispute. They consist of various advances of money, the purchase of seeds, repairs, and other miscellaneous items used in connection with Maurice's farm operations. However, as indicated above, the items of labor charges are disputed and the burden of proof lies upon Thomas to prove them.

It is noted that Thomas charged Maurice $1,270 for labor in 1961. In the same year, as a deduction from Maurice's bee earnings, there was deducted an additional sum of $780 for labor for the years 1961 and 1962, making a total labor charge in that year of $2,050. The explanation is given in the financial account that Maurice was absent three months in the years 1961 and 1962 and an additional charge at the rate of $260 per month, for a total of $780, was made on account thereof. The only testimony in support of labor charges is the testimony of Thomas. He testified that it was agreed that Maurice would be charged the cost of the labor of one man for the summer season, plus the social security charges. Thomas claims this charge was made against Maurice because he was busy with the bees and not working on the land. However, no such charge was made in 1958 which was one of the biggest income years from the bee operation. Thomas also testified that it was agreed he would charge $1.50 per acre for combining Maurice's crops; however, the financial account contains no charge for combining in the years 1958 and 1960 and no explanation was given.

The evidence also establishes that payments were made to Thomas from Maurice's bank account in various years but no credit for such payments appear on the financial account introduced in evidence which purports to cover the transactions between the brothers for the period from 1958 to 1962, inclusive. Thomas testified he received the following payments: In 1958, he received $800; in 1959, $200; in 1960, $850; and in 1961, $1,243. It appears these checks were written by Martha and were drawn on Maurice's bank account, payable to Thomas. No explanation was made of the purpose of these payments, except that they were in payment of bills Maurice owed Thomas. It is also apparent other payments were made in a similar manner in other years. For example, Martha testified that, in January of 1957, she withdrew the entire balance of $1,537 from Maurice's bank account by a check made payable to Thomas. It was supposed to be in settlement to date of the account between them. She had testified at a previous hearing the payment was made on a decision to call everything

even; however, at this trial, she testified the payment was for fertilizer, seed, and combining. This evidence, we think, demonstrates that settlements were made regularly as Maurice testified.

At the time of the trial Thomas was 42 years of age and Maurice was 44 years of age. Thomas had purchased two additional quarters of land and more bees. He owned a full line of farm machinery. He also gave flying lessons. He testified he and his brother had worked together in the manner described herein since 1953 and that he was making no claim for the period prior to 1958. Thomas testified that in the earlier years he furnished all of the farm equipment to farm Maurice's land but made no charge against Maurice for its use. Maurice had also acquired some machinery as we noted above. It appears at the time of the trial he was the owner of two tractors, two drags, one plow, one field cultivator, two trailers, two hoists, a pickup truck, a disc, and some tools. All of the field machinery of the parties was used on both farms. Maurice farmed two quarter-sections and Thomas farmed five quarter-sections. Each paid the expenses for maintenance and operation of his own machinery. No credit was given Maurice for machinery hire, even though Thomas' farm operations were two and one-half times larger than Maurice's.

Maurice is retarded. In his early youth it was found he could not attend regular school and he was sent to a special school at Minneapolis for retarded children which he attended for seven years. One of his instructors at the school testified that Maurice had an I.Q. of 68 when he entered the school and 72 when he left. The instructor further testified that academically he had reached the equivalent of about the third grade which was his ultimate capacity and they recommended he attend a trade school. After leaving the school in Minneapolis, he attended the State School of Science at Wahpeton because he was handy with his hands and apparently mechanically minded. His business and personal affairs were mainly cared for by his brother and sister-in-law, Martha, following the mother's death.

His mother, as was indicated from the republished will, was concerned about Maurice's future security and wanted to provide for him by leaving him a life estate in the two quarter-sections of land, plus the annuities which would guarantee him an income. In addition, she provided that two funds be set up to be used in case of necessity for the payment of medical bills, purchase of seed and to pay taxes. No guardian was appointed for Maurice until 1962. This proceeding arose out of the fact that Maurice became interested in one of the opposite sex who also was retarded and had a speech defect. Maurice and his girl friend went to South Dakota and were married in April of 1962. They had gone together about one year. Guardianship proceedings were commenced soon thereafter and Clarence Bladow was appointed guardian of Maurice's estate on June 1, 1962.

The petitioner in the county court was Martha Manikowske. She prayed that she be appointed the guardian. This was objected to and the parties agreed on Clarence Bladow. He was appointed by the county court and brought these actions on behalf of his ward. Maurice's wife lived with her mother and father on another farm in the vicinity. After the marriage, Maurice and his wife lived with his in-laws. Prior to that time, he lived with his brother, Thomas, and his family. When the romance developed, the trouble resulting in these actions also appears to have developed. This perhaps is not uncommon. Maurice testified that he and his brother settled the farm affairs each year and that he thought the accounts were balanced each year.

Thomas is a high school graduate and has over three years of college education. In view of the relative mental capacities of the two brothers and the relationship that existed between them, it appears that

Thomas was by far the more able and that he and his wife, Martha, dominated the business relationships between the brothers. This is admitted. It is claimed that Maurice is a spendthrift and that, because others take advantage of him in financial and property transactions, he needed someone to guide and advise him. Thomas and Martha played that role. However, Thomas and Martha testified they felt that Maurice was not incompetent but only retarded and that, as long as they guided him, he did not need a guardian. However, when he became associated with his new in-laws, this condition changed because they exercised influence over him. They requested Thomas and Martha to turn over all of Maurice's properties to Maurice and to relinquish their control. Thomas and Martha feared the in-laws would take over the management. They were opposed to this and felt Maurice was incompetent under such circumstances to manage his own affairs. Therefore, Martha petitioned the county court for letters of guardianship to be issued to her as guardian of Maurice's estate.

■ ■ It is clear from the evidence that, prior to the time that Maurice became associated with his prospective in-laws and the appointment of a guardian, the relationship between Thomas and Maurice was in the nature of a confidential or fiduciary relationship. Thomas and his wife, Martha, had voluntarily assumed a relation of personal confidence with Maurice and, therefore, must be deemed trustees. Section 59–01–08, N.D.C.C.

■ ■ It is clear from the evidence that, during the period of 1953 to 1962, Maurice had confidence in Thomas and his wife, Martha, and that he was under their domination. They voluntarily assumed the relation of personal confidence with Maurice. This is not disputed. Therefore, under Sections 59–01–07 and 59–01–08, N.D.C.C., Maurice became trustor and Thomas and Martha became trustees of an implied trust which arose by operation of law as defined by Section 59–01–05, N.D.C.C. It is based on the implied intention of the parties. Under these circumstances an implied or constructive trust will be declared by a court of equity in order to do equity. A trustee is bound to act in the highest good faith toward his beneficiary and may not obtain an advantage therein over him by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind. Section 59–01–09, N.D.C.C.

■ ■ A trustee may not take part in any transaction concerning the trust in which he has an interest, present or contingent, adverse to that of his beneficiary, unless the beneficiary had full knowledge of the motives of the trustee and of all other facts concerning the transactions which might affect his decision without the use of any influence on the part of the trustee. Section 59–01–11(1), N.D.C.C. It is clear in this case that Maurice did not have knowledge a labor charge was being made. It appears Thomas made the decisions and, although he may have told Maurice about them from time to time, the record does not establish there was an agreement that Maurice was to be charged for labor. Maurice denies such an arrangement. Thomas has failed to prove by a preponderance of the evidence that he has complied with the requirements of this statute. His position in this case is adverse to the beneficiary and he has not proven that he is entitled to come within the exception provided by the statute cited above.

■ ■ Our statute also provides that a trustee may not use the influence which his position gives him to obtain any advantage to himself, Section 59–01–12, N.D.C.C., and all transactions by which the trustee obtains any advantage from his beneficiary are presumed to be entered into by the beneficiary without sufficient consideration and under undue influence. Section 59–01–16, N.D.C.C. Taking advantage of another's weakness of mind also constitutes undue influence, Section 9–

03–11, N.D.C.C., and does not require a finding of incompetency. If Maurice was competent to handle his own business affairs, as the trial court found, it is admitted he has a weak mind and is easily taken advantage of. It is clear from the record that Thomas and his wife made the decisions. It is indicated by the financial account that the charge for labor commenced in 1959 and continued through 1962. It appears to us that this was a unilateral decision by Thomas and that he has arbitrarily made a charge for labor as shown by the financial account submitted in this trial. No original records were introduced in evidence in support of or to substantiate the labor charges and the record does not establish a history of previous labor charges. The charge for labor is for the benefit of Thomas.

Under these circumstances, claims made by Thomas against Maurice must be carefully scrutinized and all doubtful claims resolved against him. We find he has not sustained the burden of proof to the claim made for labor. A trustee may not use the influence which his position gives him to obtain any advantage from his beneficiary. Section 59–01–12, N.D.C.C..

We find that Thomas' charge for labor for the years 1959 through 1962 must be disallowed. The labor charges made total $4,707.90. In addition, we disallow the claim of $400 charged as insurance premium advanced. Thus we disallow, in addition to the amounts disallowed by the trial court, the sum of $5,107.90. The other items contained in the financial account are not in dispute.

For the reasons aforesaid, the judgment of the district court must be modified. We deduct from the money judgment allowed by the trial court in favor of Thomas the above-stated sum. This results in a net money judgment in favor of Maurice against Thomas in the amount of $2,063.42 after delivery of certain items of personal property enumerated in the district court's judgment in settlement of the farming operations for the years 1958 through 1962.

We affirm the judgment of the district court pertaining to the ownership and delivery of the various items of personal property and its disallowance of damages for detention. We direct that the judgment be modified in accordance with this opinion and, as so modified, we affirm it. Costs on appeal are allowed Maurice.

BURKE, C. J., and ERICKSTAD, J., concur.

STRUTZ, J., did not participate.

KNUDSON, J., not being a member of this court at the time of submission of this case did not participate.